# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ASHLEY THROWER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. _3:26 CV 288___ |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | **WITH JURY TRIAL DEMAND** |
| CITIBANK, N.A. | ) | |
| EQUIFAX INFORMATION SERVICES, LLC | ) | |
| EXPERIAN INFORMATION SOLUTIONS INC | ) | |
| INNOVIS DATA SOLUTIONS, INC. | ) | |
| JPMORGAN CHASE BANK, N.A. | ) | |
| MISSOURI HIGHER EDUCATION LOAN | ) | |
| AUTHORITY | ) | |
| PORTFOLIO RECOVERY ASSOCIATES, LLC | ) | |
| SHARONVIEW FEDERAL CREDIT UNION | ) | |
| SYNCHRONY BANK | ) | |
| TRANS UNION, LLC | ) | |
| UPSTART NETWORK INC. | ) | |
| WELLS FARGO BANK, N.A. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## PRELIMINARY STATEMENT

1.      The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. Congress enacted the Fair Credit Reporting Act 15 U.S.C. § 1681, *et seq.* (the "FCRA") to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

2.      Under the FCRA, consumer reporting agencies are charged with two primary duties: the duty to follow reasonable procedures to assure maximum possible accuracy of

1

information when preparing consumer reports; and the duty to reasonably reinvestigate consumers' disputes of inaccurate information.

3. Defendants participated in the compilation, maintenance and reporting of information concerning Plaintiff's creditworthiness, credit-standing, credit capacity, character, and general reputation. Then, that information was made available for use by third parties in credit transactions involving Plaintiff, for employment purposes, the underwriting of insurance for Plaintiff, and even in connection with a determination of Plaintiff's eligibility for a license or other governmental benefit.

4. Accordingly, and pursuant to various provisions of the FCRA, Plaintiff has a legally protected interest in Defendants fulfilling their respective duties under the FCRA, so that the information reported and maintained by Defendants is done so in a manner which is fair and equitable to Plaintiff, with regards to the confidentiality, accuracy, and relevancy of that information.

5. This action for damages is based on Defendants' false reporting on Plaintiff's credit file and/or consumer reports, and failures to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff.

## JURISDICTION AND PARTIES

6. This Court has federal question jurisdiction over Plaintiff's FCRA claims pursuant to 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

7. Plaintiff, Ashley Thrower, is a natural person who resides in the state of North Carolina and is a "consumer" as that term is defined at 15 U.S.C. § 1681a(c).

8. Defendants Citibank, N.A., JPMorgan Chase Bank, N.A., Sharonview Federal Credit Union, Synchrony Bank, Upstart Network, Inc., and Wells Fargo Bank, N.A. (collectively,

2

the "Furnishers") are persons who furnish information to consumer reporting agencies under the FCRA, 15 U.S.C. § 1681s-2.

9. Defendant Missouri Higher Education Loan Authority ("MOHELA"), which is headquartered in Missouri, is one of the largest student loan servicers in the nation. MOHELA was established in 1981 pursuant to the Missouri Higher Education Loan Authority Act, Title XI, Chapter 173, Section 173.350 to 173.445 of the Missouri Revised Statutes. MOHELA services approximately $380.6 billion in Direct Loans and ED-owned FFELP loans representing more than eight million accounts for borrowers across the country. MOHELA furnishes debtor's information to consumer reporting agencies and is a "furnisher" governed by FCRA at 15 U.S.C. § 1681s-2

10. Defendant, Portfolio Recovery Associates, LLC ("PRA") is a debt collector headquartered in Norfolk, Virginia and is one of the largest debt collection companies in the United States. PRA is in the business of collecting debts that originated with other parties and is considered a debt collector under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692a(6). PRA furnishes debtor's information to consumer reporting agencies and is a "furnisher" governed by FCRA at 15 U.S.C. § 1681s-2.

11. Defendants Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), Innovis Data Solutions, Inc. ("Innovis") and Trans Union, LLC ("TransUnion") (collectively, the "CRAs") prepare and sell consumer reports to third parties and each is considered a consumer reporting agency as defined by FCRA, 15 U.S.C. § 1681a(f).

**ALLEGATIONS OF FACT**

12. In January 2025, Ms. Thrower hired JG Wentworth, a financial counseling agency, to assist her in the repaying of debts that she had with the Furnishers.

13. In turn, JG Wentworth contacted the Furnishers and negotiated a repayment plan.

3

14. Based on the negotiated repayment plan, Ms. Thrower made regular deposits to a dedicated account for JP Wentworth to use to pay the Furnishers.

15. In February 2026, Ms. Thrower reviewed her credit files and learned that none of her accounts had been updated to show she had a repayment plan and that she was making payments on the debts.

16. In addition to the errors relating to the omission of the repayment plan, Ms. Thrower learned that an unknow collection and fraudulent student loan was included in her files.

17. After uncovering the foregoing errors identified in paragraphs 13 and 14 above, Ms. Thrower wrote the CRAs to dispute the debts furnished by the Furnishers.

18. In detailed fashion, and with supporting documentation, Ms. Thrower explained the inaccuracies and omissions surrounding the Defendants' reporting.

### *Errors Relating to the Omissions of the Repayment Plan*

19. From Ms. Thrower's dispute(s), the CRAs knew the debts were subject to repayment plans, that payments were being made and that a third-party financial counseling agency was handling the payments.

20. In response to Ms. Thrower's dispute(s), the CRAs took no action but to transmute the dispute into an electronic version—called an Automated Consumer Data Verification form ("ACDV")—and pass the ACDV along to the Furnishers.

21. The ACDV contained a code that categorized the dispute. However, the code alone is insufficient to describe a dispute because it over generalizes a consumer's dispute.

22. Further, the CRAs often use inappropriate codes that mischaracterize the nature and substance of a consumer's dispute.

4

23. While the consumer's dispute letter is attached to the ACDV, the Furnishers constrain their investigation to the dispute code.

24. The CRAs are aware the Furnishers do not review the letter attached to the ACDV.

25. Nonetheless, the CRAs do not conduct their own investigation and solely rely on the dispute results of the Furnisher.

26. After receiving the ACDV from the CRAs, the furnishers conducted a cursory investigation based on the dispute code and ignored Ms. Thrower's dispute letter(s).

27. The Furnishers failed to correct the inaccuracies because they merely confirmed their prior monthly reporting—which was inaccurate—was being reported verbatim and completely ignored Ms. Thrower's dispute letter and records containing her payment history.

28. Had the Furnishers considered Ms. Thrower's dispute letter(s) as part of a reasonable investigation, and/or reviewed their payment records, they would have discovered the disputed information was inaccurate, incomplete or not verifiable.

29. Based on their cursory investigation, the Furnishers instructed the CRAs to make no changes to the disputed debts.

30. The CRAs accepted the Furnishers' dispute results without evaluating the results.

31. Upon learning that the disputed debts were not corrected, Ms. Thrower disputed the debts again with the CRAs.

32. In her second dispute, Ms. Thrower informed the CRAs that she disagreed with their dispute results and asked that her consumer statement be added to her credit file.

33. Following the same procedure that was used to process Ms. Thrower's first dispute, the CRAs and Furnishers decided to make no changes to the report.

34. Not only did the CRAs and Furnishers fail to correct the inaccuracies, but they failed to properly note the debts were disputed by Ms. Thrower.

35. Numerous third parties have already received and will continue to receive credit reports—that include the inaccurate debts furnished by the Furnishers—on Ms. Thrower that are published by CRAs.

36. The third parties that receive the CRAs' credit reports are misled into viewing Ms. Thrower as a higher credit risk than she actually is.

37. Consequently, Ms. Thrower does not qualify for certain credit that she desires and needs. And the inability to correct her credit report and thereby qualify for credit has caused Ms. Thrower to suffer emotional distress.

### *Fraudulent MOHELA Student Loan Tradeline*

38. From Ms. Thrower's dispute(s) of the MOHELA account, the CRAs knew that she was the victim of identity theft, that she did not open or authorize the opening of the account, that both an FTC identity theft report and police report had been filed.

39. In response to Ms. Thrower's dispute(s), the CRAs took no action but to transmute the dispute into an electronic version—called an Automated Consumer Data Verification form ("ACDV")—and pass the ACDV along to the Furnishers.

40. The ACDV contained a code that categorized the dispute. However, the code alone is insufficient to describe a dispute because it over generalizes a consumer's dispute.

41. Further, the CRAs often use inappropriate codes that mischaracterize the nature and substance of a consumer's dispute.

42. While the consumer's dispute letter is attached to the ACDV, MOHELA constrains its investigation to address only the dispute code.

6

43. The CRAs are aware MOHELA does not review the letter attached to the ACDV.

44. Nonetheless, the CRAs do not conduct their own investigation and solely rely on the dispute results of MOHELA.

45. After receiving the ACDV from the CRAs, MOHELA conducted a cursory investigation based on the dispute code and ignored Ms. Thrower's dispute letter(s).

46. MOHELA failed to correct the inaccuracies because it merely confirmed its prior monthly reporting, which was inaccurate, was being reported verbatim and completely ignored Ms. Thrower's dispute letter and account-level documentation.

47. Had MOHELA considered Ms. Thrower's dispute letter(s) as part of a reasonable investigation, and/or reviewed account-level documentation, it would have discovered the MOHELA student loan account was opened fraudulently in the name of Ms. Thrower.

48. Based on its cursory investigation, MOHELA represented to the CRAs that the fraudulent student loan was a legitimate account that belonged to Ms. Thrower.

49. The CRAs accepted the Furnishers' dispute results without evaluating the results.

50. Upon learning that the disputed debts were not corrected, Ms. Thrower disputed the debts again with the CRAs.

51. In her second dispute, Ms. Thrower informed the CRAs that she disagreed with their dispute results and asked that her consumer statement be added to her credit file.

52. Following the same procedure that was used to process Ms. Thrower's first dispute, the CRAs and MOHELA decided to make no changes to the report.

53. Not only did the CRAs and MOHELA fail to correct the inaccuracies, but they failed to properly note the debts were disputed by Ms. Thrower.

7

54. Numerous third parties have already received and will continue to receive credit reports—that include the fraudulent MOHELA student loan account—on Ms. Thrower that are published by CRAs.

55. The third parties that receive the CRAs' credit reports are misled into viewing Ms. Thrower as a higher credit risk than she actually is.

56. Consequently, Ms. Thrower does not qualify for certain credit that she desires and needs. And the inability to correct her credit report and thereby qualify for credit has caused Ms. Thrower to suffer emotional distress.

*Unknown Collection Account from PRA*

57. The CRAs are reporting a collection account furnished by defendant PRA.

58. Ms. Thrower has no obligation to pay PRA for any debt.

59. Although PRA knows that Ms. Thrower does not owe it money, PRA reported to the CRAs that she did have obligations to pay it.

60. Reason being is that consumers will pay debts that are not owed when those debts are included in their credit reports and are obstructing their ability to obtain credit.

61. Ms. Thrower disputed the collection directly with PRA wherein she requested PRA to provide proof that she owed a debt to it.

62. Further, she demanded that PRA cease its debt collection activity until it was established that she owed a debt to PRA.

63. PRA failed to provide Ms. Thrower with information that would establish that she owed a debt to it. PRA was unable to demonstrate she owned a purported debt for Ms. Thrower because it did not purchase or obtain any debt from a creditor that she owed money.

8

64. Nonetheless, PRA continues to report to the CRAs that Ms. Thrower was obligated to pay it for the purported debt.

65. Even after receiving Ms. Thrower's disputes of the collection, the CRAs continued to include the collection in Mr. Thrower's credit reports.

66. After receiving Ms. Thrower's dispute of the PRA collection, the CRAs should have immediately deleted the collection account.

67. PRA is notorious for reporting debts that are not owed. In 2015 the Consumer Financial Protection Bureau sued PRA for "collecting on unsubstantiated debt, collecting on debt without providing required documentation and disclosures to consumers, suing or threatening legal action against consumers without offering or possessing required documentation, and suing to collect on debt outside the statute of limitations. Portfolio Recovery Associates also failed to properly investigate and resolve consumer disputes about the company's credit reporting."[1] And in 2023, "[a]fter getting caught red-handed in 2015, Portfolio Recovery Associates continued violating the law through intimidation, deception, and illegal debt collection tactics and lawsuits."

68. The CRAs' and PRA's failure to cease reporting the collection was due to their collective failure to conduct a reasonable investigation of Ms. Thrower's disputes.

69. Numerous third parties have already received and will continue to receive credit reports—that include the fraudulent MOHELA student loan account—on Ms. Thrower that are published by CRAs.

---

[1] CFPB Orders Repeat Offender Portfolio Recovery Associates to Pay More Than $24 Million for Continued Illegal Debt Collection Practices and Consumer Reporting Violations | Consumer Financial Protection Bureau (see https://www.consumerfinance.gov/about-us/newsroom/cfpb-orders-portfolio-recovery-associates-to-pay-more-than-24-million-illegal-debt-collection-practices-reporting-violations/)

70. The third parties that receive the CRAs' credit reports are misled into viewing Ms. Thrower as a higher credit risk than she actually is.

71. Consequently, Ms. Thrower does not qualify for certain credit that she desires and needs. And the inability to correct her credit report and thereby qualify for credit has caused Ms. Thrower to suffer emotional distress.

**COUNT I**
**VIOLATIONS OF THE FCRA 15 U.S.C. § 1681e(b)**

72. The CRAs violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files they published and maintained concerning Plaintiff.

73. As a result of the CRAs' violations of 15 U.S.C. §1681e(b), Plaintiff suffered actual damages, including but not limited to: harm to her credit score and credit opportunities, depression and anxiety, loss of appetite, stomach pain, nausea, headaches, chest pain and tightness, shortness of breath, irritability, sleep loss, feelings of fear, feelings of shame, difficulty concentrating, embarrassment and humiliation and harm to reputation.

74. Users of credit reports want to know when an account is subject to a third party that is managing the consumer's payments.

75. It is industry standard for a furnisher and CRA to report the involvement of a financial counseling agency when such an agency is managing the payments of the consumers.

76. Despite knowing Ms. Thrower had accounts that were managed by financial counseling agency, the CRAs deliberately chose not to report the involvement of the agency because the furnisher did not instruct them to do so.

77. The CRAs deliberate choice to omit the involvement of the financial counseling agency was willful and/or reckless.

10

78. Further, at least two circuit courts have instructed the CRAs to report the *existence* of a payment plan when an account is being repaid under such a plan. *Chaitoff v. Experian Information Solutions, Inc.*, 79 F.4th 800, 814 (7th Cir. 2023); *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 639 (6th Cir. 2018).

79. The Supreme Court warned all FCRA defendants that if they adopt an interpretation of the FCRA that is in contradiction to guidance from the court of appeals, then they may have been found to have willfully violated the FCRA. *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 70 (2007).

80. Despite the guidance from *Pittman* and *Chaitoff*, the CRAs have adopted an interpretation of the FCRA that interprets the FCRA as not requiring them to report on the existence of a payment plan.

81. The CRAs have ignored the opinion and holdings of the Circuit Courts of Appeals because the CRAs would lose profits if they adhered to those opinions and holdings.

82. The CRAs are some of the most profitable companies in the United States, if not the world. If the CRAs were not excessively greedy, they could easily budget money and allocate sufficient resources for their employees to comply with their statutory duties under the FCRA.

83. Equifax's reporting procedures are even more egregious than its sister CRAs. Specifically, Equifax religiously reports collection accounts for certain debt collectors (e.g. PRA) as credit accounts, which implies the debtor obtained and defaulted on an additional loan.

84. Either PRA is reporting to Equifax that its debts are credit accounts, or Equifax is reporting the collection accounts as credit accounts due to a defect in Equifax's software.

85. Regardless, Equifax knows it is inaccurately reporting collection accounts as credit accounts and refuses to implement procedures to correct this well-known reporting error.

11

86. Equifax believes it can get away with this illegal conduct because the general profile of the affected debtors are marginalized people without the resources to challenge Equifax.

87. Equifax's deliberate choice to knowing report inaccurate information was a willful and/or reckless violation of the FCRA.

88. The violations by CRAs were willful, rendering them liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, they were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

89. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from the CRAs in amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## COUNT TWO
## VIOLATIONS OF THE FCRA 15 U.S.C. § 1681g

90. Pursuant to 15 U.S.C. § 1681g(a)(1), CRAs must provide a consumer with all information in the consumer's file upon request from the consumer.

91. Defendant Equifax violated 15 U.S.C. § 1681g(a)(1), by failing to provide the Plaintiff with all information in his file after he requested it.

92. Equifax violated § 1681g(a)(1) by failing to provide Plaintiff with the original creditor name for certain collection accounts.

93. Equifax knows that it is required to report the original creditor's name and its' failure to do so will cause consumers not to recognize the account.

94. Notably, the two other national consumer reporting agencies, Experian and Trans Union, have abided by the CDIA's edicts and implemented procedures that assure the original creditor name is included in all collection accounts that appear in their reports.

95. According to the Consumer Data Industry Association ("CDIA"), the industry leading organization for furnishers and consumer reporting agencies, the "original creditor is required for collection agencies" and "must be present each time the account is reported."

96. Further, the CDIA states the "purpose of reporting the original creditor name is to help consumers identify the source of accounts when they appear on credit reports."

97. Continuing, the CDIA notes that "[w]ithout the original creditor names, consumers may not know what the accounts represent."

98. Upon information and belief, Equifax's failure to disclose the original creditor is due to a defect in Equifax's software that lists collection accounts in the wrong section of the report wherein accounts are displayed in formats for credit accounts that do not have a Metro II field for an original creditor.

99. Equifax continues to knowingly omit the original creditor's name because Equifax does not want to incur the costs of fixing the defect in its software.

100. Equifax has conducted a cost-benefit analysis on whether to incur the costs to fix the error or to apportion a small percentage of those would-be costs to litigating claims brought by aggrieved consumers that fell victims to its conduct.

101. In choosing to litigate rather than correct, Equifax was motivated to adopt and act on an interpretation of section 1681g that gave it grounds to litigate a defense against the claims that consumers were bound to bring against Equifax for its intentional violations of the FCRA.

102. Because the language in section 1681g and the obligations of a credit reporting agency that arise from the said language are unambiguous, to give cover to an otherwise indefensible defense, Equifax had to purposely adopt a reading of § 1681g that contravened the clear objective and instruction of the statute.

13

103. To achieve its purpose of adopting an interpretation of § 1681g that gave it cover and/or plausible denial, Equifax reads in an accuracy obligation in § 1681g where there is absolutely no language to support such reading.

104. Specifically, while the statue clearly reads "All information in the consumer's file at the time of the request" must be "clearly and accurately disclose[d] to the consumer," § 1681g(a)(1)(A), Equifax claims that § 1681g only covers inaccurate information.

105. The Supreme Court has instructed that entities governed by FCRA to steer away from interpretations of the FCRA that have no foundation based in the language of the statute. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007).

106. There is no language in § 1681g to support Equifax's interpretation that § 1681g governs only information that is inaccurate.

107. Further, the Supreme Court has instructed anyone governed by the FCRA to heed the warnings and/or holdings of the circuit courts of appeals when it comes to interpreting duties under the FCRA. And the Second Circuit stated, albeit in an unpublished opinion, that "§ 1681g requires consumer reporting agencies to 'clearly and accurately disclose ... [*a*]*ll* information,' not *all accurate information.*" *Selvam v. Experian Information Solutions, Inc.*, 651 Fed. Appx. 29, 33 (2d Cir. 2016) (citing 15 U.S.C. § 1681g(a) (emphasis in original).

108. The *Selvam* opinion was rendered in 2016, so Equifax has been on notice, from the Second Circuit, that its interpretation of section 1681g(a) was inaccurate for 10 years.

109. Additionally, during that same period, in 2015, Equifax was sued by 30+ state attorney generals for, among other things, failing to report the original creditor. More particularly, as a result of the state attorneys' litigation, Equifax agreed to "revise training materials and adopt policies and procedures to notify and instruct Collection Furnishers that the name of the Original

14

Creditor … [is a] mandatory reporting requirement[], and [Equifax] shall reject data that is not provided with the name of the Original Creditor."[2]

110. Moreover, Equifax has *direct* knowledge that its decision to omit the identity of original creditors when reporting a collection account is causing serious harm to consumers. In a recent lawsuit in the Middle District of Florida, Equifax admitted that its failure to report the name of the original creditor in collection accounts has led to "numerous other lawsuits filed against Equifax." *Clarke v. Equifax Information Services, LLC*, No. 8:25-cv-01499, ECF No. 20, fn. 1 (M.D. Fla. Oct. 1, 2025) (citing *Aguirre v. Equifax Info. Services LLC*, 0:25-cv-61099 (S.D. Fla. June 3, 2025); *Williams El v. Equifax Info. Services LLC*, No. 8:25-cv-01930 (D. Md. June 16, 2025); *Madaris v. Equifax Info. Servcs LLC et al.*, No. 1:25-cv-00503 (S.D. Ohio June 17, 2025).

111. And based on a review of Pacer for cases filed against Equifax, consumers have been suing Equifax for failing to disclose the original creditor for several years now.

112. Considering Equifax has not corrected this error after being sued by consumers for many years, the costs of litigating these lawsuits for Equifax have not been sufficient enough to deter it from violating the FCRA.

113. Therefore, a substantial punitive damages award is in tow to be levied against Equifax so that it is deterred from violating the FCRA in the future.

114. As a result of Equifax's conduct, action, and inaction, Plaintiff suffered damage as alleged above, including by example only and without limitation: deprived of important information, hampered ability to correct errors in his report, cost and time to search for the withheld information, frustration and anxiety, feelings of fear, feelings of worry, embarrassment and humiliation, and other emotional and mental distress.

---

[2]https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx

115. The violations by Equifax were willful, rendering Equifax liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

116. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Defendant Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT III**
**<u>VIOLATIONS OF THE FCRA 15 U.S.C. § 1681i</u>**

117. The CRAs violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation and delete information that was not verified as accurate and complete.

118. The CRAs violated 15 U.S.C. § 1681i by failing to review and consider all relevant information included in Plaintiff's disputes.

119. The CRAs violated 15 U.S.C. § 1681i by failing to provide proper and sufficient notice of Plaintiff's disputes to the furnishers of information disputed by the Plaintiff.

120. The CRAs violated 15 U.S.C. § 1681i by failing to promptly delete or modify the disputed information that was found to be inaccurate, incomplete or unverifiable.

121. The CRAs violated 15 U.S.C. § 1681i by failing to clearly note disputed accounts as disputed by Plaintiff and failing to add and/or include Plaintiff's statement of dispute or a clear and accurate codification or summary thereof.

122. As a result of the CRAs' violations of 15 U.S.C. §1681i, Plaintiff suffered actual damages, including but not limited to: harm to her credit score and credit opportunities, depression and anxiety, loss of appetite, stomach pain, nausea, headaches, chest pain and tightness, shortness of breath, irritability, sleep loss, feelings of fear, feelings of shame, difficulty concentrating, embarrassment and humiliation and harm to reputation.

123. The CRAs' failure to comply with 15 U.S.C. § 1681i is due to their decision to prioritize making substantial profits over complying with their duties under the FCRA.

124. Consequently, the CRAs have implemented policies and procedures that are not adequate to comply with their duties under the FCRA.

125. The CRAs have performed a cost-benefit analysis of complying with the FCRA and determined implementing policies and procedures that comply with the FCRA is more expensive than litigating lawsuits for their failures to comply with the FCRA.

126. The CRAs have purposely adopted incorrect interpretations of the FCRA when developing their policies and procedures for complying with the FCRA because they decided that the costs of complying with the FCRA will be too costly to their profit ambitions.

127. The CRAs have ignored the opinion and holdings of the Circuit Courts of Appeals because the CRAs would lose profits if they adhered to those opinions and holdings.

128. The CRAs are extremely profitable and are some of the most profitable companies in the United States, if not the entire world. If the CRAs were not overly obsessed with making substantial profits, they could easily budget money and allocate sufficient resources that are necessary and adequate to comply with their statutory duties under the FCRA.

129. The CRAs' actions were intentional or reckless, both which amount to a willful violation, rendering the CRAs liable pursuant to 15 U.S.C. § 1681n. Alternatively, the CRAs were negligent, which entitled Plaintiff to recover under 15 U.S.C. § 1681o.

130. As a result of CRAs' violations, Plaintiff suffered actual damages, including but not limited to: pecuniary expenses and costs, damage to credit profile and financial reputation, loss credit opportunities, emotional distress and feelings of physical sickness.

17

131. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Defendant pursuant to 15 U.S.C. §§ 1681n and 1681oThe violations by CRAs were willful, rendering them liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, they were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

132. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from the CRAs in amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## COUNT IV
## <u>VIOLATIONS OF THE FCRA 15 U.S.C. § 1681s-2(b)(1)</u>

133. The Furnishers, MOHELA and PRA violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to conduct a reasonable investigation of Plaintiff's dispute(s) after her disputes were furnished directly to it by co-defendant Equifax.

134. The Furnishers, MOHELA and PRA violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to conduct a reasonable investigation of Plaintiff's dispute(s).

135. The Furnishers, MOHELA and PRA violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided when the CRAs forwarded Plaintiff's dispute(s) to them.

136. The Furnishers, MOHELA and PRA violated 15 U.S.C. § 1681s-2(b)(1)(C)-(D) by failing to report back to the CRAs what information was discovered or could have been uncovered upon a reasonable investigation of Plaintiff's dispute(s).

137. The Furnishers, MOHELA and PRA violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to promptly delete or modify the disputed information—that was found to be inaccurate,

18

incomplete or unverifiable—upon a lawful investigation and prevent that disputed information from re-reporting to Plaintiff's credit files with the CRAs.

138. As a result of Defendants' violations of 15 U.S.C. §1681s-2(b)(1), Plaintiff suffered actual damages, including but not limited to: harm to her credit score and credit opportunities, depression and anxiety, loss of appetite, stomach pain, nausea, headaches, chest pain and tightness, shortness of breath, irritability, sleep loss, feelings of fear, feelings of shame, difficulty concentrating, embarrassment and humiliation and harm to reputation.

139. Users of credit reports want to know when an account is subject to a third party that is managing the consumer's payments.

140. It is industry standard for a furnisher and CRA to report the involvement of a financial counseling agency when such an agency is managing the payments of the consumers.

141. Despite knowing Ms. Thrower had debts that were managed by a financial counseling agency, the Furnishers deliberately chose not to report the involvement of the agency.

142. The Furnishers deliberate choice to omit the involvement of the financial counseling agency was willful and/or reckless.

143. Further, at least two circuit courts have instructed the CRAs to report the *existence* of a payment plan when an account is being repaid under such a plan. *Chaitoff v. Experian Information Solutions, Inc.*, 79 F.4th 800, 814 (7th Cir. 2023); *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 639 (6th Cir. 2018).

144. The Supreme Court warned all FCRA defendants that if they adopt an interpretation of the FCRA that is in contradiction to guidance from the court of appeals, then they may be found to have willfully violated the FCRA. *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 70 (2007).

19

145. Despite the guidance from *Pittman* and *Chaitoff*, the Furnishers and Debt Collectors have adopted an interpretation of the FCRA that interprets the FCRA as not requiring them to report on the existence of a payment plan.

146. The Furnishers have ignored the opinion and holdings of the Circuit Courts of Appeals because they would lose profits if they adhered to those opinions and holdings.

147. The Furnishers are extremely profitable companies and if it were not for their excessive greed, they could easily budget money and allocate sufficient resources for their employees to comply with their statutory duties under the FCRA.

148. The violations by Defendants were willful, rendering them liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, they were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

149. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from the Defendants in amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## COUNT V
## VIOLATIONS OF THE FDCPA 15 U.S.C. § 1692e

150. PRA violated 15 U.S.C. § 1692e falsely representing Plaintiff owed a debt that she did not owe.

151. PRA violated 15 U.S.C. § 1692e by reporting that Plaintiff owed it for a debt that PRA knew it did not own.

152. PRA violated 15 U.S.C. § 1692e by mischaracterizing the collection as a credit account when reporting the debt to Equifax.

20

153. As a result of PRA's violations of 15 U.S.C. § 1692e, Plaintiff suffered actual damages, including but not limited to pecuniary expenses and costs, damage to credit profile and financial reputation, loss credit opportunities, emotional distress and feelings of physical sickness.

154. Plaintiff is entitled to recover actual and statutory damages, costs and attorney's fees from the Debt Collectors in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1692k(a)(1), 1692k(a)(2)(A), and 1692k(a)(3).

**JURY DEMAND**

155. Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment for:

actual, statutory and punitive damages against all Defendants;

for her fees and costs;

for prejudgment and post-judgment interest;

and any other relief deemed appropriate by this Court.

Respectfully submitted This is the 14th day of April, 2026.

_____
John M. Harris
*Attorney for the Plaintiff*
NC Bar No. 57002
500 W 5th St STE 800 #1041
Winston-Salem, NC 27101
Telephone: (336) 995-7433
Facsimile: (336) 450-1919
john@jharrislegal.com